UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:

JAVIER HUMBERTO ONTIVEROS,

No. 13-12-12457 TA

Debtor.

## MEMORANDUM OPINION

The debtor, represented by former counsel, entered into an "Agreement or Stipulation" with his ex-wife that resolved a number of contested matters set for hearing in this case on October 12, 2012. Although Debtor signed the agreement and sought and obtained Court approval for it, he later filed a *pro se* motion to set aside the approval order. The Court held a final hearing on the motion on August 9, 2013. Being sufficiently advised, and for the reasons set forth below, the Court will deny the motion.

I.   FINDINGS

1.   On or about February 2, 2010, Debtor and wife Victoria Vasquez (Vasquez") signed a Verified Marital Settlement Agreement (the "MSA").

2.   Debtor admitted that he executed the MSA, but did not do so in the presence of the notary public who notarized his signature.

3.   The notary public testified that she had notarized Debtor's signature before, and recognized it. She further testified that at Vasquez' request she notarized Debtor's signature on the MSA, even though Debtor was not present. The notary public admitted that she should not have done so.

4.   On or about April 15, 2010, Vasquez commenced a divorce proceeding captioned *Victoria Vasquez v. Javier H. Ontiveros,* in the Third Judicial District Court, Dona Ana County, State of New Mexico, case number DM 2010-541 (the "Divorce Proceeding").

5. Vasquez filed the MSA in the Divorce Proceeding on April 15, 2010.

6. On April 20, 2010, the state court entered a Final Decree of Dissolution of Marriage (the "Final Decree") that, inter alia, ordered the parties to comply with the terms of the MSA. Debtor signed the Final Decree.

7. Debtor claims that the entered MSA was not what he agreed to. Rather, Debtor argued in state court that his agreement was conditioned on the following changes to the entered version: (1) Debtor was to receive one half of Vasquez' retirement account; (2) Vasquez was to pay one half of the debts of their business, Desert View Mechanical, Inc. ("Desert View"); (3) Debtor was to receive one half of Vasquez' $21,000 bank account; and (4) The listed value of the 1965 Ford Mustang was to have been substantially reduced.[1]

8. Vasquez disputes this assertion and maintains that the entered MSA is what Debtor agreed to.

9. At least twice, Debtor sought relief from the MSA in the Divorce Proceeding, based on the foregoing allegations. Both times, the state court declined to grant relief.

10. At the end of the state court's August 30, 2011 hearing on the MSA, the court ruled in open court:

> "I don't find any evidence that any of this was obtained by fraud . . . or any reason to provide any . . . equitable relief. I believe these numbers were what the parties believed to be, based on whatever research they did at the time. And with that, this agreement is valid and the judgment will be entered in the amount set out in the verified marital settlement agreement."

11. In the judgment that resulted from the August 30, 2011 hearing, the state court ruled, inter alia, "there is no evidence of fraud, misrepresentation, or any other evidence that

---

[1] Testimony of Debtor in the Divorce Proceeding on August 30, 2011, Tr., pp. 63-64.

-2-

would give rise to any form of equitable relief."

12. Debtor filed this bankruptcy case as a voluntary Chapter 11 case on June 28, 2012.

13. Vasquez filed a motion for relief from automatic stay, a motion to dismiss the case, and an objection to the Debtor's claim of exemptions. Debtor objected to Vasquez' proof of claim.

14. These matters were set for hearing on October 12, 2012.

15. On October 11, 2012, the parties entered into an Agreement or Stipulation (the "Agreement"). Debtor signed the Agreement.

16. Based on the request of Debtor and Vasquez, on October 17, 2012, the Court entered an Order of Interim Approval of Stipulation on Agreement Between Debtor and ex-Wife, with Notice of Opportunity of Object, doc. 79 (the "Order").

17. Vasquez sent notice to all creditors and other parties in interest of a deadline to object to the Agreement and Order. No objections were filed.

18. The Order is a final order.

19. The Agreement and Order caused a falling out between Debtor and his former bankruptcy attorney, Jerry Velarde, prompting Mr. Velarde to withdraw.[2]

20. Debtor asserts that on or about October 29, 2012, he sent a letter to the Court, a copy of which is Debtor's Exhibit 17 (the "Objection Letter"). The Objection Letter was not served on opposing counsel, or on Debtor's then-counsel Mr. Velarde. The Court has no record of receiving the letter, and it was never filed on the case docket.

---

[2] The court order granting Mr. Velarde's motion to withdraw as counsel was entered March 13, 2013.

-3-

21. On April 4, 2013, Debtor filed a *pro se* Motion to Set Aside Order of Agreement or Stipulation Entered Into this 11th Day of October, 2012, doc. 123 (the "Motion to Set Aside").

22. On May 1, 2013, after a final hearing on pending matters, the Court granted Debtor's motion to convert the case to Chapter 13.

23. Debtor thereafter retained Ron Holmes as his new bankruptcy counsel.

24. The Court held a final hearing on the Motion to Set Aside on August 8, 2013.

## II. DISCUSSION

A. <u>The Requirements of Rule 60(b)</u>. Although the *pro se* Motion to Set Aside did not specify a legal basis for relief, Debtor's new counsel, who tried the matter, argued that Debtor was entitled to relief under Fed.R.Civ.P. 60(b)(3) and/or (6).[3] Debtor's Pretrial Brief (the "Debtor's Trial Brief"), doc. 288, p. 7.

Rule 60(b) provides:

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

---

[3] Rule 60 applies in contested matters and adversary proceedings. Bankruptcy Rule 9024.

-4-

> (6) any other reason that justifies relief.

A Rule 60(b) motion gives the trial court a grand reservoir of equitable power to do justice in a particular case. *United States v. Timbers Preserve, Routt County, Colorado*, 999 F.2d 452, 454 (10th Cir. 1993), citing *Thompson v. Kerr-McGee Refining Corp.,* 660 F.2d 1380, 1385 (10th Cir. 1981), *cert. denied,* 455 U.S. 1019 (1982). A Rule 60(b) motion is left almost entirely up to discretion of trial court. *Greenwood Explorations, Ltd. v. Merit Gas & Oil Corp., Inc.,* 837 F.2d 423, 426 (10th Cir. 1988). An appellate court will reverse a trial court's denial of a Rule 60(b) motion only if the court abused its discretion, and it "find[s] a complete absence of a reasonable basis and are certain that the [trial] court's decision is wrong." *United States v. Timbers Preserve,* 999 F.2d at 454, *citing Pelican Prod. Corp. v. Marino,* 893 F.2d 1143, 1147 (10th Cir. 1990).

Rule 60(b) "is not a substitute for appeal, and must be considered with the need for finality of judgment." *Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc.,* 715 F.2d 1442, 1444 (10th Cir. 1983), citing *Brown v. McCormick,* 608 F.2d 410, 413 (10th Cir. 1979). The rule was designed to strike a "delicate balance" between respecting the finality of judgment and, at the same time, recognizing the court's principal interest of executing justice. *Cessna Fin. Corp.,* 715 F.2d at 1444.

        1.     <u>Debtor's Rule 60(b)(3) Argument Fails</u>. Debtor first argues that the Order should be set aside under Rule 60(b)(3) because of Vasquez' fraud or misconduct. The principal Tenth Circuit case on Rule 60(b)(3) motions is *Zurich North America. v. Matrix Serv., Inc.,* 426 F.3d 1281, 1290 (10th Cir. 2005). Rule 60(b)(3)'s purpose is to provide relief from judgments

that were unfairly obtained, rather than those that are factually incorrect. *Zurich,* 426 F.3d at 1292. The movant must clearly substantiate the claim of fraud, misconduct, or misrepresentation. *Id.* at 1290. Moreover, "the challenged behavior must substantially have interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial." *Id.,* quoting *Woodworker's Supply Inc. v. Principal Mutual Life Ins. Co.,* 170 F.3d 985, 993 (10th Cir. 1999). A claim for relief under 60(b)(3) is distinct from a claim of fraud on the court.[4] *Id.* at 1290-91, citing *Wilkin v. Sunbeam Corp.,* 466 F.2d 714, 717 (10th Cir. 1972), *cert. denied*, 409 U.S. 1126 (1973). Nevertheless, the Tenth Circuit applies a heightened standard of conduct, borrowed from fraud-on-the-court claims, to Rule 60(b)(3) motions, namely that the movant must prove that the adverse party had "an intent to deceive or defraud the court, by means of a deliberately planned and carefully executed scheme." *Id.* at 1292, quoting *Yapp v. Excel Corp.*, 186 F.3d 1222, 1231 (10th Cir. 1999). *See also Robinson v. Audi Aktiengesellschaft,* 56 F.3d 1259, 1267 (10th Cir.1995), *cert. denied*, 516 U.S. 1045 (1996). While there is some question whether this heightened standard would be adopted if the Tenth Circuit were to review the matter *en banc*, *see Zurich,* 426 F.3d at 1292,[5] the standard is binding on the Court. Thus, in the Tenth Circuit a successful Rule 60(b)(3) movant must establish by clear and convincing evidence that:

> --the adverse party committed fraud, misrepresentation, or misconduct;
> --the challenged behavior substantially interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial; and
> --the adverse party had an intent to deceive or defraud the court by means of a deliberately planned and carefully executed scheme.

*Zurich,* 426 F.3d at 1290-92.

---

[4] A right to relief based on fraud on the court derives from Rule 60(d)(3): "This rule does not limit a court's power to: . . . (3) set aside a judgment for fraud on the court."
[5] "We acknowledge that other circuits have applied a lesser standard. Nevertheless, we, like the district court, are bound by prior panel decisions."

-6-

a. <u>Alleged MSA Fraud</u>. Under this difficult standard, Debtor is not entitled to relief. Debtor complains of two instances of alleged fraud. First, Debtor alleges that the entered MSA does not reflect what he agreed to. Vasquez disputes this allegation and asserts that the MSA she filed in the Divorce Proceeding is the one Debtor agreed to. The state court ruled against Debtor on this issue, twice. Because of these rulings, the *Rooker-Feldman* doctrine prevents the Court from granting relief to Debtor based on alleged problems with the MSA. *See e.g. In re Staker,* 2013 WL 2233908, at*2 (10th Cir. 2013) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005), the Tenth Circuit characterized the *Rooker-Feldman* doctrine as prohibiting "state-court losers" from bringing suit in federal court "complaining of injuries caused by state court judgments rendered before [federal] district court proceedings commenced and inviting district court review and rejection of those judgments."). 2013 WL 2233908, at *2. It is clear that *Rooker-Feldman* precludes this Court from granting relief to Debtor in connection with the MSA, including any relief under Rule 60(b)(3).[6] Any such relief must come from the state court.

Further, there is no connection between the alleged MSA fraud and entry of the Order. Debtor knew about the alleged problems with the MSA long before he signed the Agreement and sought approval of the Order. It is a non sequitur to urge that the Court's Order, entered October

---

[6] Even if the Court were able to grant relief, it might not do so. While there is some evidence supporting Debtor's allegations of MSA fraud, it is not inconclusive. Mostly, it is Debtor's word against Vasquez'. Vasquez' false deposition testimony (see below) certainly hurts her credibility. However, Debtor's testimony in state court about the variances between the entered MSA and what he agreed to are not consistent with the hand written changes (in Debtor's Exhibit 2) that Debtor elsewhere asserted reflected his agreement. In particular, in his state court testimony Debtor made no mention of his proposal to divide the house equity in half; to reduce the value of the Harley Davidson from $24,300 to $10,000; or obtain an appraisal for Desert View (presumably to pay Vasquez half of the appraised value). Each of these three items is financially significant, particularly the changes concerning the house and Desert View. The fact that Debtor did not mention them to the state court makes it difficult for the Court to determine the strength of Debtor's claim that he did not agree to the terms of the entered MSA. The Court makes no finding on the issue.

-7-

17, 2012, be set aside under Rule 60(b)(3) because of an alleged fraud on the state court that occurred in April, 2010.

    b. <u>Vasquez' False Deposition Testimony</u>.  Debtor's other instance of alleged fraud or misconduct is Vasquez' false testimony at her September 19, 2012 deposition.  When deposed, Vasquez testified that Debtor signed the MSA in the notary public's presence.  The relevant testimony follows:

> Q. Were you present when Mr. Ontiveros signed the marital settlement agreement, Exhibit 2?
> A. No.
> Q. Do you know whether or not he signed in front of [the notary public]?
> A. Yes, he did sign in front of her.
> Q. Well, if you weren't there, how do you know?
> A. Because she said so and he said so.
> Q. He came out and said, "Boy, I signed that in front of [the notary public] and now it's done"?  Is that what happened?
> A. Correct.[7]

At the final hearing on her Motion to Dismiss, however, Vasquez admitted that Debtor was not present when his signature on the MSA was notarized, but rather that she took the MSA (which Debtor admits he signed) to the notary, who notarized both parties' signatures.  Vasquez presumably changed her story because Debtor had, in the meantime, deposed the notary public, who testified truthfully.[8]

Vasquez' false deposition testimony does not form the basis for Rule 60(b)(3) relief. Debtor was not defrauded by Vasquez' perjury—he of all people knew Vasquez' deposition

---

[7] Debtor's exhibit 20, pp. 37-38.

[8] Debtor's exhibit 21, p. 20.  At the final hearing on the Motion to Set Aside, the notary testified that Vasquez had pressured her to lie if called before the state court to testify about whether Debtor signed the MSA in the notary's presence.

-8-

testimony was false. Furthermore, there could be no fraud on the Court because Vasquez' testimony at the final hearing was truthful.

Debtor argues that, had Mr. Velarde been in possession of the perjury evidence later obtained by Debtor, Mr. Velarde would not have urged Debtor to accept the Agreement. Debtor's Trial Brief, p. 9. The Court does not find this argument particularly persuasive. Mr. Velarde and Debtor knew that Vasquez' deposition testimony was false, due to Debtor's personal knowledge of the actual events. It seems unlikely, therefore, that Mr. Velarde would have varied his negotiating position substantially had he been in possession of better evidence of perjury. Furthermore, Vasquez' perjured deposition testimony does not go to the heart of Debtor's complaint about the MSA—Vasquez could easily have altered the MSA after it had been notarized properly, so the fact that the notary was not present when Debtor signed the MSA is not of particular significance.

While there are potential, severe consequences for perjury and/or suborning perjury, those are separate matters from setting aside the Order, the entry of which was not obtained by, or tainted with, such wrongful conduct. Given the facts of this case, Vasquez' false deposition testimony is not sufficient to meet the high standards set forth in *Zurich*.

        2.    <u>Debtor's 60(b)(6) Argument Fails</u>. Debtor's alternative ground for relief is Rule 60(b)(6). Rule 60(b)(6) provides that a court may relieve a party from a final judgment, order, or proceeding for "any other reason that justifies relief." Fed.R.Civ.P. 60(b)(6). "The rule gives courts ample power to vacate judgments whenever that action is appropriate to accomplish justice." Wright, Miller & Kane, Federal Practice and Procedure, Civil 2d § 2864, citing *Klapprott v. United States,* 335 U.S. 601 (1949).

-9-

Rule 60(b)(6) and rules 60(b)(1)-(5) are mutually exclusive. *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863 (1988) (clause (6) and clauses (1) through (5) are mutually exclusive); *In re Gledhill,* 76 F.3d 1070, 1080 (10th Cir. 1996) (citing *Liljeberg,* the Tenth Circuit stated that "a court may not premise Rule 60(b)(6) relief, however, on one of the specific grounds enumerated in clauses (b)(1) through (b)(5)").

Rule 60(b)(6) should only be applied in "extraordinary circumstances. *Liljeberg,* 486 U.S. at 863, *citing Ackermann v. United States,* 340 U.S. 193, 199 (1950); *In re Gledhill,* 76 F.3d at 1080 (same); *Johnson v. Cigna Corp.,* 14 F.3d 486, 497 (10th Cir. 1993), *cert denied*, 514 U.S. 1082 (1995) (same).

Generally, to warrant relief under Rule 60(b)(6), the situation for which relief is sought must have been beyond the control of the movant. *See Ackermann,* 340 U.S. at 202.

Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary. As the Tenth Circuit discussed in *Van Skiver v. United States:*

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by *Pierce* [ *v. Cook & Co.,* 518 F.2d 720, 722 (10th Cir.1975)(en banc) ]. In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs ... were injured." *Pierce,* 518 F.2d at 723. However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6). *Collins v. City of Wichita,* 254 F.2d 837, 839 (10th Cir.1958).

952 F.2d 1241, 1244–45 (10th Cir. 1991), *cert. denied*, 506 U.S. 828 (1992).

      a.    <u>The Objection Letter</u>. Debtor advances three arguments in support of his request for Rule 60(b)(6) relief.[9] First, Debtor argues that his Objection Letter, which he

---

[9] To the extent Debtor seeks relief under 60(b)(6) based on the alleged fraudulent activity discussed in connection

-10-

intended to function as an objection to the Order, should be considered by the Court as an "equitable ground" upon which to grant relief. Debtor's Trial Brief, p. 7. This argument must be overruled for a number of reasons. First, the Objection Letter was not filed in the case, was not sent to opposing counsel, and was not served on Debtor's own counsel. Indeed, there is no record that the Court ever received a copy of the Objection Letter. Second, the Objection Letter did not ask that the Order be set aside; rather, Debtor only asked that he be given a change to "be heard in court." Third, Debtor was represented by counsel at the time, and therefore should not have been attempting to file papers in the bankruptcy case. Finally, Debtor should not have been objecting to the Agreement or Order, which he signed and/or approved only two-three weeks before.[10]

      b.      <u>Counsel Advice on Recharacterizing Debt</u>. Debtor's second argument in support of his Rule 60(b)(6) motion is that he should never have agreed to treat $80,000 of Velasquez' claim as domestic support obligation, since the MSA states that all amounts he owes Vasquez are property settlement. Debtor blames bad legal advice for his agreement on this point. He would like relief so he could treat his entire obligation to Vasquez as dischargeable under 11 U.S.C. § 1328(a).[11]

Vasquez counters that the $80,000 agreement was reasonable because there is substantial case law under which the Court could have recharacterized some of Debtor's

---

with Rule 60(b)(3) above, the request should be denied because of the mutual exclusivity of 60(b)(3) and 60(b)(6). However, to the extent, if any, that the alleged fraudulent conduct does not come within 60(b)(3), the Court finds that it does not form the basis for 60(b)(6) relief, for the reasons stated above.

[10] The Court is mindful of the fact that what Debtor really wants to achieve is to set aside the Agreement he signed. That desire goes beyond Rule 60 relief. Even if the evidence Debtor presented was sufficient to justify Rule 60 relief (it is not), it would be insufficient to allow Debtor to get out of his settlement agreement.

[11] Domestic support obligations are nondischargeable in Chapter 13 cases, *see* 11 U.S.C. §§ 523(a)(5) and 1328(a)(2), while property division obligations are dischargeable. *See* 11 U.S.C. §§ 523(a)(15) and 1328(a)(2).

-11-

obligations under the MSA as domestic support obligations, regardless of how the parties characterized them. Mr. Velarde testified that he counseled Debtor to accept the $80,000 compromise because he was concerned about the debt recharacterization possibility. Mr. Velarde was right to be concerned.

Whether a debt is in the nature of support is a matter of federal bankruptcy law, not state law. *In re Goin,* 808 F.2d 1391, 1392 (10th Cir. 1987); *Loper v. Loper (In re Loper),* 329 B.R. 704, 707 (10th Cir. BAP 2005); *In re Rodriguez,* 465 B.R. 882, 889 (D.N.M. 2012).

In *Sampson v. Sampson (In re Sampson),* 997 F.2d 717 (10th Cir. 1993), the Tenth Circuit held that in determining the nature of an obligation to a former spouse, courts should 1) determine the parties' intent regarding the nature of the obligation; and 2) determine the substance of the obligation. *Sampson,* 997 F.2d at 723. In ascertaining intent, how debts are labeled in a marital settlement agreement or divorce decree is not determinative. *See Sampson,* 997 F.2d at 722–723. *See also In re Phegley,* 443 B.R. 154, 158 (9th Cir. BAP 2011) (a divorce decree's characterization of an award as maintenance or alimony does not bind a bankruptcy court). Courts should look at the totality of the circumstances at the time of the award. *Johnson v. Hamblen (In re Hamblen)*, 233 B.R. 430, 434 (Bankr. W.D. Mo. 1999). The *Hamblin* court stated the test as follows:

> The parties' intent is determined by the totality of circumstances at the time of the award, *In re Frye,* 231 B.R. 71, 73 (Bankr. E.D. Mo. 1999); *In re Williams,* 703 F.2d at 1057–58, but most courts have narrowed the inquiry down to one or more of three main factors: (1) the language and substance of the dissolution decree or separation agreement, *In re Kline,* 172 B.R. 279, 281 (Bankr. W.D. Mo. 1994); *In re Peterson,* 133 B.R. 508, 512 (Bankr. W.D. Mo. 1991); (2) the relative financial circumstances at the time of the dissolution; *Holliday v. Kline,* 65 F.3d. at 751; *In re Stamper,* 131 B.R. at 433, 435 (Bankr. W.D. Mo. 1991); and (3) the degree to which the obligation enables the recipient to maintain daily necessities. *In re*

> *Stamper,* 131 B.R. at 435; *In re Jensen,* 17 B.R. 537, 539–40 (Bankr. W.D. Mo. 1982) (holding that a debtor's obligation to pay various joint consumer debts was nondischargeable where the award was "intended to free money that she [the non-debtor spouse] might otherwise have to pay the debtor's bills so that she might use it for her own maintenance and support.").

233 B.R. at 434.

In ascertaining the substance of an obligation, the critical question is the function served by the obligation at the time of the divorce. *Sampson,* 997 F.2d at 725–726, quoting *In re Gianakas,* 917 F.2d 759, 763 (3d Cir.1990). Factors considered include: 1) the relative financial circumstances of the parties; 2) the language and substance of the marital settlement agreement or divorce decree; 3) the degree to which the obligation enables the receiving spouse to afford daily living expenses; and 4) the parties' future prospects for financial support. *Hamblen,* 233 B.R. at 434. *See also Goin,* 808 F.2d at 392–1393 (holding (1) if the agreement fails to provide explicitly for spousal support, the court may presume that the property settlement is intended for support if it appears under the circumstances that the spouse needs support; (2) when there are minor children and an imbalance of income, the payments are likely to be in the nature of support; (3) support or maintenance is indicated when the payments are made directly to the recipient and are paid in installments over a substantial period of time; and (4) an obligation that terminates on remarriage or death is indicative of an agreement for support.").

The relevant time period is when the debt arose. *See Kessel v. Kessel (In re Kessel),* 261 B.R. 902, 908 (Bankr. E.D. Tex. 2001); *In re Martinez,* 230 B.R. 314, 318 (Bankr. W.D. Tex. 1999); *Merrill v. Merrill (In re Merrill),* 252 B.R. 497, 507 (10th Cir. BAP 2000), *aff'd,* 15 Fed. Appx. 766 (10th Cir. 2001). Thus, neither the parties' current financial situation (unless it was anticipated at the time of the divorce), nor the fact that the receiving party intends to use the

-13-

award to pay for current living expenses, is relevant to whether a debt is in the nature of support. *See, e.g., Lewis v. Trump (In re Trump),* 309 B.R. 585, 594 (Bankr. D. Kan. 2004) (the parties' current income is not relevant to the determination of § 523(a)(5) dischargeability).

Applying this law to the facts of this matter, the Court concludes that Mr. Velarde's concern about recharacterization was reasonable. Vasquez presented evidence that she had been counting on receipt of MSA-required payments to live on while she found a smaller house and organized her post-divorce life. She testified that her general idea was to live for six month's on her salary and savings while Debtor refinanced the home mortgage and otherwise raised the capital needed to pay Vasquez under the MSA. Thereafter, she had counted on cash payments from Debtor to supplement her income. The Court does not, and need not, make any findings about whether it would have recharacterized some of Debtor's MSA obligations to Vasquez as domestic support obligations. However, the Court does find that such recharacterization was a risk that Debtor was wise to consider.[12]

Further, the evidence before the Court is that Debtor would have had to pay Vasquez at least $30,000 or so under a Chapter 13 plan, even without the Agreement. By agreeing to pay an additional $50,000, Debtor eliminated the risk that the case would be dismissed on good faith grounds, or that his property settlement obligation would be recharacterized as domestic support obligation for more than $80,000. Based on elimination of the recharacterization risk and the other benefits Debtor obtained under the Agreement, the Court concludes that the

---

[12] In general, the Court would be reluctant to allow one spouse to retain almost all marital assets, including a valuable business, by promising to pay the other spouse half the value of the retained assets, and then discharge the payment obligation in a subsequent bankruptcy case. Such a maneuver would appear unfair. The present case presents more complicated facts, of course, both because Vasquez likely will get whatever equity there may be in the house, and also because the values assigned to some of the personal property Debtor retained appears to unrealistically high.

-14-

Agreement was reasonable.[13]

In any event, Rule 60(b)(6) does not allow parties to set aside agreements they later wish they had not struck. Having second thoughts about the wisdom of a deal does not constitute an "extraordinary circumstance" that justifies setting aside a final order. Furthermore, counseling Debtor to accept the Agreement may have been good advice, and falls far short of the kind of extraordinary legal error required under *Van Skiver*.

    c. <u>Alleged Counsel Pressure</u>. Debtor's final argument is that he was pressured to sign the Agreement by Mr. Velarde. The Court finds this argument lacks merit. First, as set forth above, the Court believes that the Agreement and Order are reasonable. Debtor perhaps could have struck a better bargain, but he also could have agreed to less favorable terms and still have been within the range of reasonableness. *See In re Edwards,* 961 F.2d 219, at *2 (10th Cir. 1992) (approval of a settlement under Bankruptcy Rule 9019 involves the analysis of the following factors: (a) the probability of success in litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises); *In re Gordon,* 484 B.R. 811, 817 (Bankr. N.D. Okla. 2013) (settlement should be approved if it is "within the universe of reasonable actions" and does not "fall below the lowest point in the range of reasonableness"). Under this standard, the settlement reflected in the Agreement certainly

---

[13] The Agreement did not fix the problem in the MSA that Debtor agreed to pay Vasquez $229,000 for her portion of anticipated equity in their house. It now appears that total house equity may be closer to $100,000 than the $458,000 Debtor and Vasquez originally projected. If so, Vasquez will receive all of the equity if and when the house sells. Nevertheless, Debtor agreed to this amount, and the state court declined to modify the MSA to give Debtor relief. Debtor's consolation is twofold: (1) any debt he may owe Vasquez because she does not receive $229,000 from the house sale will be dischargeable; and (2) he will retain Desert View by paying $80,000, an apparent bargain price.

-15-

appears likely to have been approved by the Court over the objection of a creditor. Mr. Velarde's advice to agree to its terms, therefore, is not grounds to grant Rule 60(b)(6) relief.

Second, the Court finds that Mr. Velarde did not threaten to abandon the Debtor at the final hearings scheduled on October 12, 2012. Rather, the Court finds that Mr. Velarde did nothing more than urge (albeit strongly) Debtor to sign the Agreement. Mr. Velarde testified that he believed the Agreement was very favorable to the Debtor. He testified that he urged Debtor to sign the Agreement, but that he never threatened to leave Debtor in the lurch if Debtor declined to do so. Mr. Velarde also testified that he would never do that to a client, because he is well aware that such a threat would be a flagrant breach of his ethical duties. The Court finds that Mr. Velarde's testimony on these points is credible.

Because the Court finds that the Objection Letter does not provide a basis for relief, that the Agreement is reasonable to Debtor, and that Mr. Velarde did not coerce Debtor into signing the Agreement, the Court concludes that Debtor did not carry his burden of showing the "exceptional circumstances" required for relief under Rule 60(b)(6). Debtor's motion to set aside the Order under that rule must therefore be denied.

### III. CONCLUSION

Debtor has not met the high standards for setting aside the Order under Rule 60(b)(3) and/or (b)(6). The Motion shall be denied. A separate order will be entered.

Honorable David T. Thuma  
United States Bankruptcy Judge

Date entered on docket: September 4, 2013.

-16-

Copies to:

Ron Holmes
112 Edith Blvd, NE
Albuquerque, NM 87102

Bud Kirk
600 Sunland Park Drive
Bldg. Four, Suite 400
El Paso, TX 79912